IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VENI WAYNE FONOTI, | No. CV 08-0853 CW |
|     Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
|     v. | |
| KEN CLARK, Warden, | |
|     Respondent. | |

_____/

Petitioner Veni Wayne Fonoti filed a petition for a writ of habeas corpus pursuant to title 28 U.S.C. § 2254, challenging as a violation of his constitutional rights the denial of parole by the California Board of Parole Hearings[1] (Board) on August 5, 2004.[2] Respondent Ken Clark opposes the petition and Petitioner has filed a traverse.

Having considered all of the papers filed by the parties, the Court denies the petition.

---

[1] The Board of Prison Terms was abolished effective July 1, 2005, and replaced with the Board of Parole Hearings. Cal. Penal Code § 5075(a).

[2] The papers do not directly specify how many parole denials Petitioner received before the August 5, 2004 hearing. However, it appears that the August 5, 2004 hearing was Petitioner's third hearing before the Board.

BACKGROUND

I.  The Commitment Offense

The following summary of the facts of Petitioner's commitment offense is derived from the appellate court's opinion on direct appeal, People v. Fonoti, No. B029624 (Cal. Ct. App. July 20, 1988).

> Defendant drove for about 5 minutes in a residential area (15 mile zone) making right and left turns in an attempt to lose Officer Zabel who was a considerable distance behind; driving 40 and 50 miles per hour through traffic controlled intersections, he traveled approximately 4 miles; at no time were Defendant's lights on.  Driving directly at a police car coming from the opposite direction to assist in the pursuit, Defendant caused Officer Ryan to "jam on" his brakes and turn abruptly to avoid a collision.  Meanwhile, Officer Zabel gained on Defendant and when he was "very, very close" to the Blazer, Defendant, for no apparent reason, suddenly "slammed on" his brakes making a "complete" stop causing Officer Zabel to "plow" into the rear of the Blazer whereupon Defendant turned and sped away; both vehicles were damaged but still operable.  Officer Zabel followed but dropped behind Officers Ryan and Arthur who had activated lights and sirens on their police car.
>
> Defendant drove through a city intersection at 50 miles per hour, then turned onto Long Beach Boulevard where the speed limit varies from 30 to 35 miles per hour and there were numerous traffic light controlled major city intersections; he drove through 5 intersections against red lights at speeds of 55, 70, and 75 to 80 miles per hour; Officer Zabel's police car reached a speed of over 100 miles per hour pursuing Defendant on Long Beach Boulevard.  Before coming to Willow Street, a car had to slam on its brakes to avoid being hit as Defendant went through a red light; when Defendant crossed the intersection at Willow his speed exceeded 95 miles per hour; at Anaheim a pedestrian had to jump up over the curb to avoid being run over by Defendant; several vehicles had to slam on their brakes to keep from being hit.  The officers began to lose ground because the lights were red against them; at Spring Street, a California Highway Patrol car joined the pursuit.
>
> Defendant came to the freeway entrance but, because of his speed, was unable to turn to enter; as he approached the overpass, a Plymouth Fury containing [twenty-three

> year old Jeffrey] Cady and [twenty-one year old David] Jacoby was making its turn onto Long Beach Boulevard from the freeway exit, when the Blazer, without lights and at high speed, crashed into the driver's side of the Fury killing Cady instantly and fatally injuring Jacoby; the impact was "very great" and of such force that both vehicles rose three feet off the ground and the Blazer came to rest on the center divider 125 feet north of the overpass; Defendant was in the Blazer unconscious bleeding profusely from the forehead; there was massive damage to both vehicles and debris covered the street.
>
> Defendant was the sole defense witness. About 8 p.m. on March 7, he walked across the street to a bar in which he spent three or four hours; he drank a couple of beers and mixed drinks, played pool and talked to a lady he met there who was also drinking; she asked him to take her home; when he left he felt "kind of high" but not drunk; after they left the bar the lady asked him for $25; when she admitted she was a prostitute he told her to get out because he was married; she refused and he tried to push her out; he got out and slapped her and pulled her out of the car, and she began shouting; he got back into his car but that is all he recalled; the next thing he remembered was waking up at the hospital.

People v. Fonoti, No. B029624 at 3-5.

Petitioner was twenty-five years old at the time he committed the offense. Trans. at 18.

A jury found Petitioner guilty of two counts of second degree murder, assault against a police officer, evading a police officer and hit and run. He is serving two terms of fifteen-years to life, to run concurrently. Lodgment 1, July 1, 1987 state court judgment. In 1992, Petitioner was convicted of possessing a weapon while confined in a penal institution and sentenced to a consecutive two-year term. Pet's Ex. C, March, 2004 Life Prisoner Evaluation Report at 2.

II. August 5, 2004 Board Hearing

The Board found that Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society if released

3

1  from prison.  The Board cited the commitment offense which was
2  carried out in an especially cruel and callous manner and with a
3  demonstrated disregard for human life because, as a result of a
4  traffic collision caused by Petitioner, multiple victims died.  The
5  Board also cited a March 1, 2002 psychological report authored by
6  Dr. Eric Rueschenberg, a forensic psychologist, who concluded that
7  Petitioner presented a low to moderate risk of violence in the
8  community with a potential relapse into alcohol use as the primary
9  risk factor and a tendency to exercise poor judgment as the
10 secondary risk factor.  Pet's Ex. A at 6.  Dr. Rueschenberg noted
11 that, in the past, Petitioner's poor judgment had led him to become
12 involved in conflictual relationships in the community as well as
13 in prison, and that before the commitment offense, he was actively
14 abusing alcohol, getting into bar fights and showing a tendency
15 toward violence against women.  Id.  After he was incarcerated,
16 Petitioner continued to relapse into alcohol use and occasional
17 violence.  However, during the latter part of his incarceration,
18 Petitioner had become more serious about recovery, improved himself
19 and stayed out of trouble, preparing himself for parole
20 consideration.  Id.

21     The Board also noted that Petitioner lacked realistic parole
22 plans.  The Board pointed out that Petitioner had an immigration
23 hold for Samoa, so that he probably would be deported upon release.
24 Petitioner wanted to live in the house he had previously built
25 there.  Nonetheless, the Board noted that Petitioner had failed to
26 obtain support letters indicating he could live in Samoa.  The
27 Board also noted that Petitioner had failed to submit a letter from
28

4

a friend or relative in California ensuring that Petitioner had a place to live in California if he were not deported.

The Board commended Petitioner for his completion, in 2002, of a twenty-four week course in Alcoholics Anonymous and the self-help course, Way to Happiness, and, in 2004, a TV video course, the Importance of Fatherhood. The Board noted that Petitioner's last disciplinary reports were in October, 1997 and in 2001.

The Board concluded that the positive aspects of Petitioner's behavior did not outweigh the factors indicating unsuitability for parole. The Board recommended that Petitioner remain disciplinary-free, work toward reducing his custody level so that more program opportunities would become available to him, participate in any self-help and substance abuse programs that were available and cooperate with the clinicians in the completion of a new clinical evaluation before the next parole suitability hearing. The Board also found that, until Petitioner demonstrated that he could cope with stress in a non-destructive manner, his behavior was unpredictable and a threat to others.

In a separate decision, based on the same factors discussed above, the Board found that it was not reasonable to expect that Petitioner would be granted parole during the following two years.

III. Superior Court Habeas Decision

On January 20, 2005, the California superior court issued a written decision denying Petitioner habeas relief. See Lodgment 8, In re Fonoti, BH003024 (Cal. Sup. Ct. Jan. 20, 2005). The court noted that the Board had based its decision on the following factors: (1) the commitment offense was especially cruel in that

5

1   multiple victims were killed in the same incident; (2) the
2   psychological report was not totally supportive of release because
3   it concluded that Petitioner posed a low to moderate degree of risk
4   of violence if released based upon a potential for violent behavior
5   and relapse into alcohol use, which Petitioner had exhibited prior
6   to and since his incarceration; and (3) Petitioner lacked realistic
7   parole plans in that he failed to provide letters indicating he
8   would have a residence if released.
9       The court accepted the first two factors as some evidence
10  supporting the Board's decision, but rejected the Board's third
11  reason, noting that Petitioner had an immigration hold pending
12  which suggested that he would be deported upon release to Samoa,
13  his native country, and that the record showed that Petitioner had
14  financial resources and a house in Samoa.  The court rejected
15  Petitioner's argument that the Board failed to apply properly the
16  considerations set forth in Penal Code § 3041 because the Board had
17  considered Petitioner's positive institutional gains but found that
18  they did not outweigh the factors demonstrating that he was
19  unsuitable for parole.  The court summarily rejected as without
20  merit Petitioner's arguments that the Board has a no-parole policy
21  and that the Board abused its discretion in allowing Petitioner to
22  remain handcuffed during the hearing.  Thus, the court affirmed the
23  Board's decision based on the fact that there was some evidence in
24  the record to show that Petitioner was a danger to public safety if
25  released into the community.
26      Petitioner filed subsequent habeas petitions in the California
27  court of appeal and the California Supreme Court.  Both petitions
28

6

were summarily denied. (Lodgments 10, 12). Subsequently, Petitioner brought this federal habeas corpus petition challenging the state court decisions upholding the Board's determination.

## LEGAL STANDARD

Because this case involves a federal habeas corpus challenge to a state parole eligibility decision, the applicable standard is contained in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002).

Under AEDPA, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000). A federal court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1).

Where, as here, the highest state court to reach the merits issued a summary opinion which does not explain the rationale of its decision, federal court review under § 2254(d) is of the last state court opinion to reach the merits. Bains v. Cambra, 204 F.3d 964, 970-71, 973-78 (9th Cir. 2000). In this case, the last state court opinion to address the merits of Petitioner's claim is that of the California superior court.

DISCUSSION

Petitioner argues that (1) he was denied due process because the Board's decision was not supported by some evidence that he is presently dangerous; (2) the commitment offense was not particularly egregious in comparison to other second degree murders; (3) the Board did not allow Petitioner fully to represent himself because he was restrained in handcuffs during the hearing; (4) the Board improperly based its finding of unsuitability on opposition by the district attorney; (5) there was no evidence to support the Board's finding that Petitioner needed more self-help to assist him in dealing with the causative factors of the commitment offense and understanding his involvement in the crime and the underlying substance abuse issue; (6) the Board failed to consider the amount of time Petitioner had served and the determinate term that would be set by the matrix; (7) the Board made its decision based on its "no parole" policy; (8) the Board failed to give a separate statement of reasons for imposing the two-year denial; and (9) the Board improperly concluded that the psychiatric report constituted a basis for parole denial.

The United States Supreme Court has clearly established that a parole board's decision deprives a prisoner of due process with respect to his constitutionally protected liberty interest in a parole release date if the board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary." Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006) (citing Superintendent v. Hill, 472 U.S. 445, 457 (1985)).

Respondent argues that California inmates do not have a

8

federally protected liberty interest in parole release and that the Ninth Circuit's holding to the contrary in Sass is not clearly established federal law for the purposes of AEDPA. However, this Court is bound by Ninth Circuit authority. See, e.g., Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007) (all California prisoners whose sentences provide for the possibility of parole are vested with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause); McQuillion, 306 F.3d at 898 ("under clearly established Supreme Court precedent, the parole scheme in California . . .[gives] rise to a constitutionally protected liberty interest). Therefore, this claim fails.

When assessing whether a state parole board's unsuitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state. Sass, 461 F.3d at 1128. Accordingly, in California, the court must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record to determine whether the state court decision constituted an unreasonable application of the "some evidence" principle. Id.

California law provides that a parole date is to be granted unless it is determined "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration

9

. . ."  Cal. Penal Code § 3041(b).

The California Code of Regulations sets out the factors showing suitability or unsuitability for parole that the Board is required to consider.  See Cal. Code Regs. tit. 15 § 2402(b).  These include "[a]ll relevant, reliable information available," such as,

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.  Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in finding of unsuitability.

Id.

Circumstances tending to show unsuitability for parole include the nature of the commitment offense and whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner."  Id. at (c).  This includes consideration of the number of victims, whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense."  Id.  Other circumstances tending to show unsuitability for parole

10

1 are a previous record of violence, an unstable social history,
2 previous sadistic sexual offenses, a history of severe mental
3 health problems related to the offense, and serious misconduct in
4 prison or jail.  Id.

5    Circumstances tending to support a finding of suitability for
6 parole include no juvenile record, a stable social history, signs
7 of remorse, that the crime was committed as a result of significant
8 stress in the prisoner's life, a lack of criminal history, a
9 reduced possibility of recidivism due to the prisoner's present
10 age, that the prisoner has made realistic plans for release or has
11 developed marketable skills that can be put to use upon release,
12 and that the prisoner's institutional activities indicate an
13 enhanced ability to function within the law upon release.  Id. at
14 (d).  In a recent decision, the California Supreme Court stated
15 that due process is denied when "an inquiry focuse[s] only upon the
16 existence of unsuitability factors."  In re Lawrence, 44 Cal. 4th
17 1181, 1208 (2008).

18    Respondent contends that, even if California prisoners do have
19 a liberty interest in parole, the due process protections to which
20 they are entitled by clearly established Supreme Court authority
21 are limited to an opportunity to be heard and a statement of
22 reasons for denial.  This position, however, has likewise been
23 rejected by the Ninth Circuit, which held in Irons, 505 F.3d at 851
24 that a prisoner's due process rights are violated if the Board's
25 decision is not supported by "some evidence in the record," or is
26 "otherwise arbitrary."  The "some evidence" standard identified is
27 thus clearly established federal law in the parole context for

11

purposes of § 2254(d).  <u>Sass</u>, 461 F.3d at 1128-1129.

As noted above, because the superior court ruled that the Board's justification for Petitioner's unsuitability for parole based on his lack of parole plans was unfounded, it upheld the denial of Petitioner's parole based on two findings of the Board: (1) the commitment offense was especially egregious primarily because it involved multiple victims and (2) Petitioner's psychological evaluation concluded that he presented a low to moderate risk of violence due to his tendency to abuse alcohol and to use poor judgment.

The fact that the commitment offense involved multiple victims is one of the factors indicating egregiousness listed in title 15, California Code of Regulations section 2402 (c).  There is no dispute that Petitioner's offense involved multiple victims.

The court was not unreasonable in finding that Petitioner's psychological evaluation provided some evidence of dangerousness. As stated above, Dr. Rueschenberg concluded that Petitioner presented a low to moderate risk of violence in the community due to the risk that he would relapse into alcohol use and his tendency to exercise poor judgment.  Petitioner admitted that he began drinking as a teenager and that he continued using alcohol even after he was incarcerated.

Petitioner argues that the court improperly characterized his psychiatric report as unfavorable because it focused on the negative aspects of the report rather than the positive.  Although the report concluded that Petitioner had recently become serious about recovering from alcoholism, improving himself and staying out

12

of trouble, the fact remains that the report provides some evidence of a risk to public safety.

Petitioner argues that there was no evidence to support the court's finding that the Board properly applied the considerations set forth in Penal Code § 3041.  However, the court was not unreasonable in its conclusion that the Board considered Petitioner's positive gains in prison, but found that they did not outweigh the factors suggesting unsuitability.  Petitioner also argues that the Board improperly found that he needed more self-help classes to assist him with understanding the causative factors of the commitment offense and the underlying substance abuse.  However, as noted above, Petitioner admitted that using alcohol had been a problem for him since he was a teenager and that he continued abusing it even after he was incarcerated.  Furthermore, the psychiatrist recommended that Petitioner continue with self-help and therapy prior to release.  Trans. at 31.  Therefore, the state court's denial of this claim was not unreasonable.

Petitioner argues that the Board did not allow him to represent himself fully because he was handcuffed during the proceeding.  However, the transcript of the hearing belies this argument; the Board members gave Petitioner many opportunities to respond to their findings, to answer their questions and to make his own statements.  Therefore, the court's rejection of this claim was not unreasonable.

Petitioner argues that the Board improperly based its unsuitability finding on the district attorney's opposition to parole.  The state court reasonably rejected this claim because the

13

1  Board noted such opposition, but did not cite it as a factor in its
2  finding that Petitioner was unsuitable for parole.  Petitioner's
3  claim that the Board failed to give a separate statement of reasons
4  for imposing a two-year denial is also undermined by the record of
5  the hearing.  <u>See</u> Trans. at 64 (stating that, in a separate
6  decision, the Board was denying parole for two years and providing
7  specific reasons for this finding).

8      Petitioner argues that the matrix of prison terms set forth in
9  section 2403(c) of title 15 of the California Code of Regulations
10 establishes a uniform prison term for second degree murder and,
11 because he has been in prison longer than the time set by the
12 matrix, his statutory right to a determinate term has been
13 violated.

14     The regulations contain a matrix of suggested base terms for
15 several categories of crimes.  <u>See</u> 15 Cal. Code Regs. § 2403.  For
16 second degree murders, the matrix of base terms ranges from the low
17 of fifteen, sixteen, or seventeen years to a high of nineteen,
18 twenty, or twenty-one years, depending on some of the facts of the
19 crime.  However, the relevant statute and regulations provide that
20 the matrix is used to calculate the sentence only after an inmate
21 has been found suitable for parole.

22     The statutory scheme places individual suitability for parole
23 above a prisoner's expectancy in early setting of a fixed date
24 designed to ensure term uniformity.  <u>In re Dannenberg</u>, 34 Cal. 4th
25 1061, 1070-71 (2005).

26     While subdivision (a) of section 3041 states that
    indeterminate life (i.e., life-maximum) sentences should
27     "normally" receive "uniform" parole dates for similar crimes,

14

>subdivision (b) provides that this policy applies "<u>unless</u> [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raises "<u>public safety</u>" concerns requiring further indefinite incarceration. Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a <u>continuing public danger</u>.

<u>Id.</u> at 1070 (emphasis, brackets, and parentheses in original). The regulation cited by Petitioner explicitly states, "The panel shall set a base term for each life prisoner who is found suitable for parole." 15 Cal. Code Regs. § 2403(a). "[T]he Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life-maximum prisoner's crime individually." <u>Dannenberg</u>, 34 Cal. 4th at 1071. The California Supreme Court's determination of state law is binding in this federal habeas action. See <u>Hicks v. Feiock</u>, 485 U.S. 624, 629 (1988); <u>Sandstrom v. Montana</u>, 442 U.S. 510, 516-17 (1979).

Furthermore, the matrix does not set a statutory maximum term of years for a person convicted of second degree murder. California Penal Code § 190 sets the statutory maximum for such an inmate at life imprisonment.

Because the Board found that Petitioner would be a danger to public safety if released, it had no statutory duty to set a maximum term for Petitioner. The state court's denial of this claim was not contrary to or an unreasonable application of Supreme Court authority.

Finally, Petitioner argues that the Board improperly found him unsuitable for parole based upon a "no parole" policy. Petitioner

15

argues that the Board "failed to accord proper deference to its own 'preponderance' of 'material' and 'relevant' evidence standard, <u>and</u> failed to consider Petitioner's actual period of confinement and the appropriate determinate term of § 2403(c) in the suitability inquiry, <u>and</u> failed to fix his primary term."  Petition at 21.

As discussed above, the state court's rejection of these arguments was not contrary to or an unreasonable application of Supreme Court authority.

In sum, the state court's finding that the Board had some evidence to conclude that Petitioner was a danger to public safety if released on parole, and the state court's denial of Petitioner's due process claims, were not contrary to or an unreasonable application of Supreme Court authority.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

Dated: 10/15/09

CLAUDIA WILKEN
United States District Judge

16